UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
(at Covington)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Action No. 2: 11-01-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| RASHARD ROSS, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court for consideration of Defendant Rashard Ross' Motion to Suppress. [Record No. 39] The Court held an evidentiary hearing on the motion on March 24, 2011. After considering the parties' submissions, arguments, and evidence, the Court will deny the relief sought by the defendant.

**I.   Background and Relevant Facts**

On August 31, 2010, a Federal Express package from Mexico, addressed to 610 Orchard Street, Elsmere, Kentucky, was intercepted by Immigrations and Customs ("ICE") officials at the United States border. The package appeared suspicious. After drilling the box to inspect its contents, ICE agents found over 70 grams of heroin in the package. On September 1, 2010, the package was delivered to Homeland Security in Northern Kentucky.

On September 3, 2010, the package was delivered by an undercover agent to 610 Orchard Street. The package was accepted by Curtis Widner who signed for the package and was subsequently arrested. Trooper Clay Johnson of the Kentucky State Police executed a search

warrant on Widner's home after the arrest. Officer Johnson testified that, during an interview following the arrest, Widner informed authorities that he was accepting the package on behalf of an individual named "Twan." Widner also told police that, the day before the package arrived, an individual identified as "Mike," and who claimed to represent Twan, had come to Widner's home to collect the package. Widner was able to provide authorities with a description of Mike and the car he used. The authorities had Widner attempt to contact Twan to inform him that the package had arrived. Officer Johnson also testified that Widner's family members were given instructions to immediately notify police if anyone returned to collect the package. Officer Johnson further testified that the local police were advised of the ongoing investigation and asked to assist if needed.

Shortly thereafter, police dispatch received a 9-1-1 call from Widner's mother. She alerted police that an individual was at her front door in an effort to "do a drug deal." When asked whether she knew the individual, she responded, "I don't know him, he came here yesterday looking for a package. . . . He's come back today . . . ." In other words, Mrs. Widner identified the man at the door as the man who had previously visited to collect the drugs (*i.e.*, "Mike"). She described "Mike" as a black man wearing a white shirt and an orange hat.

The police officer nearest the scene (Officer Brandon Marksberry) also testified at the suppression hearing. Officer Embry had informed Officer Marksberry at the beginning of Marksberry's shift that federal authorities were conducting a drug investigation in the area that may require assistance from local police. Officer Marksberry received a dispatch that a suspicious person was knocking at the door of 610 Orchard Street. He was given the description

that the caller provided: a black male, white shirt, orange hat. As he approached the residence, he observed a black male getting into a car to drive away. As the car drove away, he was able to identify the individual in the back seat as wearing an orange hat. Officer Marksberry then activated his lights and stopped the vehicle. After stopping the car, Officer Marksberry stood by to await the arrival of Officer Embry who he understood to be the main contact with federal authorities. Officer Embry then notified a pre-determined list of federal contacts that the suspects had been stopped.

Officer Marksberry testified that, once Officer Embry arrived on the scene, Marksberry approached the stopped vehicle and asked for identification from each of its occupants. The driver was identified as James Dawson. Officer Marksberry ran a local warrant and NCIC check on Dawson's license. The check of Dawson's license indicated that Dawson was a permit-only driver, which meant he required to have a licensed driver in the passenger seat. However, there were no other licensed drivers in the car. After double-checking Dawson's driving status, Officer Marksberry placed Dawson under arrest for driving without a license. During his conversation with Dawson, Dawson refer to the individual in the back seat — Defendant Ross — as "Mike."

After Dawson was placed under arrest, Ross and another individual (Stanley Brown) remained in the car. Officer Marksberry observed that Ross appeared to be using a cell phone to place calls or send text messages. Officer Marksberry testified that he was concerned that occupants of the car might be informing other members of the drug conspiracy that they had been stopped. Officer Marksberry explained that he feared that Ross or Brown may contact

"Twan" to tip him off regarding the stop and advise him to destroy any additional evidence. As a result, he again approached the car and asked he occupants to turn over their cell phones. Each complied, with Brown giving Officer Marksberry two cell phones and Ross surrendered one additional phone.

Federal authorities arrived on scene and began to interview the three individuals. They eventually learned that the car did not belong to any of the three occupants. As a result, the federal authorities contacted the owner and obtained consent to search the car. This search resulted in the recovery of two additional cell phones. At the conclusion of the stop, Dawson was placed under arrest while Brown and Ross were permitted to leave the scene. Police returned Brown's cell phones to him. However, when asked which of the cell phones was his, Ross denied ownership of any of the remaining phones.

**II.     Analysis**

Ross has moved to suppress all evidence obtained as a result of the stop and search that occurred on September 3, 2010. He argues that the search was unconstitutional for two reasons. First, Ross claims that the original stop of the vehicle and questioning of its occupants was not supported by reasonable suspicion. Second, he asserts that, even if the stop was supported by reasonable suspicion, it lasted so long that it became a *de facto* arrest that was not supported by probable cause. The United States asserts that, because Ross denied owning the items searched, he lacks standing. Second, it contends that, given the totality of the circumstances, the stop was supported by reasonable suspicion and only lasted as long as necessary to effectuate its investigatory purpose.

In analyzing the constitutionality of the police's actions, there are three phases of the stop that must be examined. First, the police stopped the automobile for an investigative detention. Later, Officer Marksberry seized a telephone from Ross. Finally, the police searched the car and found additional cell phones. Under the circumstances presented, the Court concludes that each action is either supported by a constitutionally-adequate justification or is isolated from challenge because Ross lacks standing to contest it. As an initial matter, Ross, as a passenger, does not have standing to challenge the search of the car. However, because the search was preceded by a stop, the stop itself must pass constitutional muster for the result of the search to be admissible. In this case, when viewing the collective knowledge available to the police, the stop was justified by reasonable suspicion. The same justification that supported the stop supports the temporary seizure of Ross' cell phone. Police then kept Ross' phone because he disclaimed ownership, which also defeats his standing to challenge its continued seizure. Finally, the stop did not last so long as to become a *de facto* arrest; however, even it did, it would have been constitutional because, as the stop extended, the police had sufficient probable cause to arrest Ross. The stop, seizure, and search were all reasonable in light of the circumstances and the evidence resulting from each will not be excluded during the upcoming trial.

### A. The Search of the Car

Police officers searched the passenger compartment of the car in which Ross had been riding and found a number of cell phones. To the extent Ross challenges this portion of the search, his challenge fails because he lacks standing. A person only has standing to challenge a search or seizure if he or she has a legitimate expectation of privacy in the property at the time

-5-

of the search or seizure. *See Katz v. United States*, 389 U.S. 347, 353 (1967). Passengers in a vehicle do not have a legitimate expectation of privacy regarding a search of a vehicle that does not belong to them. *Rakas v. Illinois*, 439 U.S. 128, 148 (1978) (defendants had no legitimate expectation of privacy in the glove compartment or area beneath the seats in a car in which they were merely passengers); *see also United States v. Torres-Ramos*, 536 F.3d 542, 549 (6th Cir. 2008) (passengers lacked standing to challenge the search of the van in which they were riding). Because Ross was neither the driver nor owner of the car, he had no expectation of privacy regarding the contents of its passenger compartment. His expectation of privacy is even further diminished by the fact that police obtained the consent of the car's owner before conducting the search. Therefore, any challenge Ross makes to the constitutionality of this part of the search fails.

This does not end the Court's inquiry into the constitutionality of the evidence police obtained. Because the stop of the vehicle obviously preceded the search, the stop itself must have been constitutional. Otherwise, subsequent actions — like the search or the care and seizure of phones — may be "fruit of the poisonous tree." *See United States v. Pearce*, 531 F.3d 374, 381 (6th Cir. 2008).

### B. Reasonable Suspicion for the Stop

The law is well-settled that if a police officer "possesses a reasonable and articulable suspicion" that criminal activity may be afoot, "he may briefly detain the suspect and investigate the suspicious circumstances." *United States v. Hurst*, 228 F.3d 751, 756–57 (6th Cir. 2000) (quoting *United States v. Bentley*, 29 F.3d 1073, 1075 (6th Cir. 1994)). When examining

whether an officer's suspicion of criminal activity was reasonable, courts must consider the totality of the circumstances surrounding the stop. *United States v. Martin*, 289 F.3d 392, 399 (6th Cir. 2002). "[T]he totality of the circumstances approach allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them." *Id.* Further, officers can rely on information gathered by other police officers or law enforcement personnel. *See United States v. Hensley*, 469 U.S. 221, 233 (1985); *United States v. Campbell*, 549 F.3d 364, 371 (6th Cir. 2008) ("Pertinent circumstances include the officer's own direct observations, dispatch information, directions from other officers."). Ultimately, a "reasonable suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence." *Hurst*, 228 F.3d at 757 (citing *United States v. Sokolow*, 490 U.S. 1 (1989)).

Considering the totality of the circumstances in the present case, Officer Marksberry possessed reasonable suspicion that individuals in the car he stopped were engaged in criminal activity. Because police had instructed Widner to notify "Twan" of the package's arrival. This instruction was given in the hope that Twan or individuals acting on his behalf would again return to the residence to obtain possession of the package. Local police had been informed of the ongoing investigation, and were told to be available for a call seeking assistance. Thereafter, Widner's mother alerted police that *the same person* who had been at the residence the preceding day was now at her front door. She also identified the man as wearing an orange hat. When Officer Marksberry responded to the call, he observed an individual wearing an orange hat getting into a car in front of the residence at 610 Orchard Street. This information constitutes

reasonable suspicion that at least one individual in the car was involved in the drug conspiracy being investigated. Officer Marksberry was justified in stopping the car and temporarily detaining its occupants to further investigate that suspicion.

### C. Seizure of Telephones

During the investigative detention that followed, police temporarily seized a number of cell phones. Officer Marksberry testified that, while Ross and Brown were sitting in the car, he witnessed attempts to make calls or send text messages. At the time, he was aware that the stop involved an investigation of ongoing drug trafficking activities. Thus, his fear that the occupants of the vehicle may be attempting to alert other involved parties of the stop was reasonable. Officer Marksberry testified that he was concerned other evidence may be damaged or destroyed, so he approached the car and asked the occupants for their cell phones. Brown turned over two cell phones and Ross turned over one. Officer Marksberry then placed the cell phones on the rear of the car where they remained for the duration of the stop. At the end of the temporary investigative detention, the police returned Brown's phones to him. However, Ross denied ownership of any of the remaining phones.

"[T]he Supreme Court has recognized that some brief detentions of personal effects may be permitted based upon reasonable suspicion falling short of probable cause, provided that such detentions are 'minimally intrusive.'" *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 543–44 (6th Cir. 2002) (quoting *United States v. Place*, 462 U.S. 696, 706 (1983)). The Sixth Circuit further explained that "'seizures of personal effects when based on anything less than probable cause' are permitted only to the extent that they satisfy the standards

for reasonableness applicable to 'Terry-type investigative detentions.'" *Farm Labor*, 308 F.3d at 544 (quoting *United States v. Saperstein*, 723 F.2d 1221, 1231 (6th Cir. 1983)). In other words, the reasonable suspicion that supports a *Terry* stop also justifies a temporary detention of personal property. And the reasonable suspicion supporting the stop in question also supports the temporary seizure of personal property during the stop. Therefore, the Court concludes that the police officers were justified in temporarily detaining Ross' and Brown's cell phones while the investigative stop proceeded.

The question of whether some greater justification is needed because the police *kept* particular phones need not be addressed directly because Ross disclaimed ownership of the phone while it was being temporarily detained. When an individual affirmatively disclaims ownership of an object, he "disclaims any concern about whether or not the contents of [the object] remain private." *United States v. Tolbert*, 692 F.2d 1041, 1045 (6th Cir. 1982) (quoting *United States v. Miller*, 589 F.2d 1117, 1131 (1st Cir. 1978)). In short, Ross forfeited standing to challenge the search or seizure of that property by his affirmative actions. When he advised police that the remaining seized phones were not his, Ross surrendered any expectation of privacy in the phones or their contents.

### D. Length of the Stop

Ross' final argument is that, due to its length, the investigative stop became a *de facto* arrest. Consequently, he asserts that the officers' actions must be supported by probable cause. The United States responds that the stop was no longer than necessary but, in any event, the totality of information available to the officers constitutes probable cause.

Under the facts presented, the Court concludes that the stop was not longer than necessary to complete the investigation. The Supreme Court has explained that "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Fla. v. Royer*, 460 U.S. 491, 500 (1983). "It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Id.* If a *Terry* stop lasts for an unreasonable length of time, it becomes a *de facto* arrest and must be supported by greater levels of suspicion. *See United States v. Orsolini*, 300 F.3d 724, 730 (6th Cir. 2002) ("[A]n officer's investigative detention can mature into an arrest or seizure if it occurs over an unreasonable period of time." (internal citations omitted)); *Campbell*, 549 F.3d at 372 ("The detention must last no longer than is necessary to carry out the purpose of the stop; otherwise, it may become an arrest that must be supported by probable cause."). There is "no rigid time limitation on the lawfulness of a *Terry* stop." *Orsolini*, 300 F.3d at 730. Thus, a court should instead "examine whether police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 687 (1985).

In the present case, the evidence indicates that the officers were diligent in their investigation of Ross and did not detain him longer than necessary to confirm their suspicions. In *Orsolini*, the stop in question lasted nearly an hour. 300 F.3d at 730. Just as in the case at hand, the officers spent a significant amount of that time waiting for other units to arrive. *Id.* (explaining that the officers waited thirty-five minutes for a canine unit to arrive). In the present

case, Officer Marksberry waited for Officer Embry, who he understood to be the main contact with federal agents, before even approaching the car.[1] Officers Marksberry and Embry then waited for state and federal agents before questioning or interviewing the individuals. Once federal agents arrived, they proceeded to speak to each of the detained individuals separately.

Because the authorities had to separate and interview three different individuals, the length of the stop was somewhat extended. Further, a number of agencies were present: local police, Kentucky State Police, and federal agents. The time it took to evaluate the information obtained and coordinate between the agencies necessarily added to the time of the stop. The Court also notes that, none of the occupants asked to leave at any point during the detention. Likewise, neither Brown nor Ross was handcuffed or placed under arrest. When considering the circumstances, there is no reason to conclude: (i) that the officers were not diligently pursue their investigation or (ii) that the detention lasted any longer than was reasonably necessary to effectuate the purpose of the stop. *See Orsolini*, 300 F.3d at 730. In summary, the stop did not constitute a *de facto* arrest and the reasonable suspicion articulated above was sufficient justification for the investigative detention.

Further, *even if* the stop was unreasonably long, the facts learned as the investigation progressed would have justified an arrest of Ross. Shortly after the stop of the subject vehicle, police had probable cause to believe that Defendant Ross was engaged in drug trafficking

---

[1] Officer Marksberry had information indicating that the three occupants of the vehicle were engaged in drug trafficking activities. In light of this information – and due to the danger presented by individuals believed to be actively engaged in such conduct – his prudent action in waiting for backup before engaging the subjects is entirely reasonable and consistent with that of a trained police officer.

activities. Ross matched the description of the person Widner's mother had described to police in her 9-1-1 call. Ross was wearing a white shirt and orange hat and he had been identified as the black make who had come to Widner's house on two separate occasions looking to pick-up the Federal Express package known to contain heroin. Further, Marksberry heard Ross referred to as "Mike" during the stop.

When federal agents arrived on the scene, they explained that the person they were looking for was "Mike." As the stop continued, it became clear that Ross was identified by that name. Considering that: (i) Widner told the police "Mike" had attempted to collect the package; (ii) Dawson and Brown both referred to Ross as "Mike;" (3) Ross was in a car leaving Widner's house immediately after the 9-1-1 call; and (4) Ross was wearing an orange hat (the most obvious identifying factor provided by Widner's mother to describe the man who was at her door), police had probable cause to arrest Ross for his connection with the drug conspiracy. Therefore, even if the stop had been unreasonably long, it would not be unconstitutional because the police had probable cause to suspect Ross was attempting to possess heroin.

### III. Conclusion

The stop, search, and seizure that Ross challenges in his motion to suppress were all constitutional. The stop was supported by a reasonable suspicion of criminal behavior. Therefore, both the temporary stop and temporary seizure of cell phones were reasonable. As the temporary investigative detention continued, police developed probable cause to arrest Ross, had they desired to do so. And although the Court concludes that the stop of the subject vehicle and temporary detention of its occupants was not unreasonably long, the officers' actions were

supported by probable cause.  Finally, Ross lacks standing to challenge other police actions which include the search of the car and continued seizure of cell phones.  Accordingly, it is hereby

**ORDERED** that Defendant Rashard Ross' Motion to Suppress [Record No. 39] is **DENIED**.

This 4th day of April, 2011.

Signed By:
*Danny C. Reeves* DCR
United States District Judge